2015 UT App 68

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
ANTHONY LINTZEN,
Defendant and Appellant.

Opinion
No. 20120814-CA
Filed March 26, 2015

Fourth District Court, Heber Department
The Honorable Derek P. Pullan
No. 111500127

Dana M. Facemyer, Attorney for Appellant

Sean D. Reyes and Kris C. Leonard, Attorneys
for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGE
JOHN A. PEARCE and SENIOR JUDGE PAMELA T. GREENWOOD
concurred.[1]

ROTH, Judge:

¶1     Defendant Anthony Lintzen appeals his conviction for aggravated sexual abuse of a child, a first degree felony. We affirm.

---

1. The Honorable Pamela T. Greenwood, Senior Judge, sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

BACKGROUND

¶2      Lintzen sexually abused his stepdaughter (Stepdaughter) for several years.[2] The first time the abuse occurred, Stepdaughter was in kindergarten or first grade and Lintzen licked her genital area. Following this first incident, Lintzen continued to sexually abuse Stepdaughter in various ways over the next several years. Lintzen also showed her pornographic pictures and videos of adults and children engaged in sexual acts.

¶3      Stepdaughter first reported the abuse to her biological father who told her that if Lintzen tried to abuse her again, Stepdaughter should tell her mother (Mother) or the police. Stepdaughter eventually reported the abuse to her sister, who told Mother. Mother asked Lintzen to move out, and he did so for a few weeks. In the meantime, at Lintzen's urging, Mother allowed Stepdaughter to talk with a family friend (Friend), a Peruvian citizen, who Lintzen believed "had some kind of background" related to child pornography cases. Friend spoke with Stepdaughter and then told Mother and Lintzen that it was his opinion that Stepdaughter was being exposed to pornographic material by someone but that it was not Lintzen. Lintzen convinced Mother that he had done nothing wrong and moved back in. Stepdaughter's allegations were not reported to authorities.

¶4      A few months later, in September 2011, when Stepdaughter was ten years old, Lintzen abused Stepdaughter

---

2. "[W]e recite the facts in the light most favorable to the jury's verdict, but present conflicting evidence to the extent necessary to clarify the issues raised on appeal." *State v. Vigil*, 922 P.2d 15, 18 (Utah Ct. App. 1996) (citation and internal quotation marks omitted).

again while Mother was at work and Stepdaughter was home with her brother and sister (the Charged Incident). Her siblings were in the basement, and Stepdaughter fell asleep while watching television on Mother's bed. Lintzen entered the room and began massaging Stepdaughter's back. When she started to wake up, he told her to go back to sleep and continued the massage, eventually massaging her breasts and genitals both over and under her clothing. Stepdaughter was alert enough to feel the touching and looked down to see Lintzen touching her vaginal area. After she awoke completely, Lintzen asked her if she had had a nice dream.

¶5    A day or two later, Stepdaughter was waiting in the car with her sister when she saw her neighbor who was a police officer. Stepdaughter approached the officer and told him what Lintzen had done to her during the Charged Incident. The officer called the sheriff's office, and another officer spoke with Stepdaughter and filed a report. Stepdaughter was later interviewed by a detective at the Children's Justice Center (the CJC). She reported that Lintzen had abused her multiple times over the years and that some of these incidents had involved Lintzen penetrating her both vaginally and anally with his penis and his fingers. Stepdaughter also stated that, in addition to the touching she had reported earlier to officers, Lintzen had penetrated her with both his penis and his fingers during the Charged Incident.

¶6    Lintzen was charged with aggravated sexual abuse of a child. Before trial, the State filed a motion in limine seeking admission of evidence of Lintzen's prior abuse of Stepdaughter. The trial court granted the motion, admitting evidence related to the prior incidents of sexual abuse under rule 404(c) of the Utah Rules of Evidence. The court admitted evidence of Stepdaughter's allegations that Lintzen showed her pornography under rule 404(b).

¶7     Stepdaughter testified at trial. After she described the first time she was abused by Lintzen, Stepdaughter testified about the Charged Incident. When Stepdaughter described Lintzen touching her genitals with his hand, the State asked her whether his fingers "stay[ed] outside of [her] body, or did they ever go inside of [her] body" during the incident. Stepdaughter replied, "[O]utside."[3] Stepdaughter then testified about other incidents of abuse that had occurred prior to the Charged Incident. Her testimony about these events was also different from the statements she had made at the CJC about these same incidents because her testimony seemed to imply, at least in the defense's view, that no penetration, either vaginal or anal, had ever occurred.[4]

¶8     The nurse practitioner who examined Stepdaughter after the Charged Incident (the Nurse) also testified at trial. The Nurse testified that she had recommended counseling for Stepdaughter and her entire family, including an evaluation regarding counseling for Stepdaughter's brother (Brother). When defense counsel asked the Nurse about the recommended evaluation and counseling for Brother, she explained that Mother had told her

---

3. While it does not appear Stepdaughter was ever asked directly if Lintzen penetrated her with his penis as well as his fingers during the Charged Incident, the parties seem to be in agreement that Stepdaughter's testimony effectively refuted any prior claim she may have made of penile penetration during the Charged Incident.

4. The State contests this interpretation on appeal, arguing that Stepdaughter's testimony at trial amounted to a denial of penetration during the Charged Incident but was consistent with allegations that vaginal penetration had occurred during prior incidents. Because of the way we resolve the issues on appeal, we conclude that it is unnecessary to resolve this dispute.

that Brother "had four or five years of problems with pornography and masturbating in front of his siblings." The Nurse also testified that Mother had told her "that if anyone could have been a sexual abuser it would have been [Brother]." Lintzen then moved for admission of the written medical report that the Nurse had prepared as a result of her examination and interviews with Stepdaughter and her family. The trial court denied the motion on hearsay grounds and also observed that the document contained essentially the same statements about Brother that the Nurse had already testified to and was therefore cumulative as well.

¶9     The jury convicted Lintzen of one count of aggravated sexual abuse of a child. Lintzen filed a motion for a new trial arguing that the trial court had erred in its evidentiary rulings by admitting the State's evidence of prior abuse and by excluding the Nurse's written report from evidence. He also argued that he was entitled to a new trial based on the discovery of new evidence, namely the testimony of Friend, whose whereabouts Lintzen had only recently discovered.[5] The trial court denied the motion, and Lintzen appeals.

ISSUES AND STANDARDS OF REVIEW

¶10    Lintzen argues that the trial court erred when it admitted evidence of his prior abuse of Stepdaughter at trial. "A trial court's admission of prior bad acts evidence is reviewed for abuse of discretion, but the evidence must be scrupulously

---

5. Lintzen told the court that he had intended to call Friend as a witness but had been unable to locate him in time for trial. But after the trial was over, Lintzen reported that Mother had provided him with Friend's contact information in Peru, where he had moved before the trial began.

examined by trial judges in the proper exercise of that discretion." *State v. Verde*, 2012 UT 60, ¶ 13, 296 P.3d 673 (citation and internal quotation marks omitted); *see also State v. Bragg*, 2013 UT App 282, ¶ 16, 317 P.3d 452.

¶11 Lintzen also argues that the trial court erred when it denied his motion for a new trial. A trial court's denial of a motion for a new trial is reviewed for abuse of discretion. *State v. Billingsley*, 2013 UT 17, ¶ 9, 311 P.3d 995. The trial court's factual findings underlying the decision are reviewed for clear error, and the court's application of law to those facts is reviewed for correctness. *Id.*

ANALYSIS

I. The In Limine Order

¶12 Lintzen argues that the trial court "erred in entering the [in] limine order," which permitted evidence at trial of Lintzen's prior abuse of Stepdaughter. We conclude that the trial court thoroughly considered the appropriate factors before deciding to admit evidence of Lintzen's prior abuse of Stepdaughter and that the in limine order was an appropriate exercise of its discretion regarding the admission of evidence.

¶13 Before trial, the State sought admission of "uncharged crimes, wrongs, or acts committed by [Lintzen] against [Stepdaughter]" under rules 404(b) and 404(c) of the Utah Rules of Evidence. In particular, the State sought the admission under rule 404(c) of evidence related to Stepdaughter's statements in the CJC interview that (1) Lintzen had sexually abused her "more than 20 times"; (2) the first such incident occurred when she was very young and involved Lintzen licking her genitals while Mother was in the shower; (3) Lintzen had required her to touch or lick his penis as many as four times; (4) Lintzen had penetrated her anally with his penis more than once and "kinda"

penetrated her vaginally on one occasion; and (5) Lintzen had shown her pornographic material, some of which depicted children.

¶14 Rule 404(b) prohibits admission of evidence of "crime[s], wrong[s], or other act[s]" for the purpose of proving "a person's character in order to show that on a particular occasion the person acted in conformity with the character," otherwise known as propensity evidence. Utah R. Evid. 404(b)(1). However, such evidence may be admitted for other purposes, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2). There is an important exception to the general bar on admission of propensity evidence where "a defendant is accused of child molestation"; in such circumstances, rule 404(c) permits a court to "admit evidence that the defendant committed any other acts of child molestation *to prove a propensity* to commit the crime charged." *Id.* R. 404(c)(1) (emphasis added). "'[C]hild molestation' means an act" involving "a child under the age of 14 which would, if committed in this state, be a sexual offense or an attempt to commit a sexual offense." *Id.* R. 404(c)(3).

¶15 Before admitting such evidence, a trial court must consider whether "its probative value is substantially outweighed by a danger of . . . unfair prejudice." *Id.* R. 403; *see also State v. Verde*, 2012 UT 60, ¶¶ 17–18, 296 P.3d 673 (holding that rule 403 assessment "is essential to preserve the integrity of rule 404(b)"); *State v. Ferguson*, 2011 UT App 77, ¶ 15 n.4, 250 P.3d 89 (holding that evidence may come in under rule 404(c) only after an analysis under rule 403). In conducting a rule 403 analysis, the trial court may consider what have become known as the *Shickles* factors, which include (1) "'the strength of the evidence as to the commission of the other crime,'" (2) "'the similarities between the crimes,'" (3) "'the interval of time that has elapsed between the crimes,'" (4) "'the need for the evidence,'" (5) "'the efficacy of the alternative proof,'" and (6) "'the degree to which the evidence probably will rouse the jury

to overmastering hostility.'" *State v. Burke*, 2011 UT App 168, ¶ 34, 256 P.3d 1102 (quoting *State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988)). Each factor need not be considered in every case, but a district court evaluating 404(b) and 404(c) evidence should consider those factors it finds "helpful in assessing the probative value of the evidence." *State v. Lucero*, 2014 UT 15, ¶ 32, 328 P.3d 841; *Burke*, 2011 UT App 168, ¶ 34 (applying the *Shickles* factors to an analysis of evidence admitted under rule 404(b)); *Ferguson*, 2011 UT App 77, ¶ 15 n.4 (explaining that the *Shickles* factors are also applicable to a rule 403 analysis of rule 404(c) evidence).

¶16    Here, the trial court determined the prior acts the State sought to admit, other than the evidence related to allegations that Lintzen showed Stepdaughter pornography, admissible under rule 404(c).[6] The trial court then analyzed the evidence under rule 403 by applying the *Shickles* factors and determined that the danger of unfair prejudice did not substantially outweigh the probative value of the evidence. Lintzen argues the trial court erred in reaching this conclusion. In doing so, Lintzen appears to focus specifically on the trial court's analysis of the second and third *Shickles* factors—similarity of the crimes and the time interval between the crimes—as the bulk of his argument centers on his contentions that the prior acts are too egregious in comparison to the Charged Incident or too distant in time to warrant admission under rule 403.

¶17    In determining whether the prior acts and the Charged Incident were sufficiently similar, the trial court acknowledged the prior acts of sodomy were "more egregious" but ultimately

---

6. On appeal, Lintzen contests the admission of the 404(c) evidence but not the court's determination that the pornography-related evidence was admissible under rule 404(b). Accordingly, we do not address the pornography-related evidence further.

found all of the prior acts that Stepdaughter had described in her statements were "generally consistent [with] the digital penetration" that was alleged to have occurred in the Charged Incident. In a particularly thorough written analysis, the court noted that "[b]efore Rule 404(c), one primary concern in admitting other acts similar to the charged offense was that the jury would engage in propensity reasoning, punishing the Defendant because he was the sort of person who does this type of thing." However, the court then explained that "[a]fter Rule 404(c), the accused's propensity is the reason for admission and no longer constitutes unfair prejudice." The trial court also acknowledged the danger that a jury might be tempted to convict a defendant not simply because the evidence supports a conviction but to punish him for the other bad acts. However, paraphrasing *State v. Reed*, 2000 UT 68, 8 P.3d 1025, the trial court determined that

> most important[ly], similar acts of abuse committed by the same defendant, against the same victim, during the same uninterrupted course of conduct are not likely to prejudice a jury, because jurors will either believe or disbelieve [Stepdaughter] based on her own credibility, not on whether she asserts that act occurred three times or six times.

In considering the "interval of time" factor, the trial court again relied on the "course of conduct" concept, determining that "[a] period of five to six years is not a long interval of time" when "[t]he acts occurred frequently and were part of an on-going course of conduct."

¶18 Lintzen criticizes the trial court's reliance on *Reed*, but we believe the case is useful here. In *Reed*, the defendant befriended a ten-year-old child, eventually molesting him twenty to thirty times over a three-and-a-half-year period. *Id.* ¶¶ 2, 6. The defendant was charged with two counts of sodomy on a child

and one count of aggravated sexual abuse. *Id.* ¶ 1. The defendant opposed the admission at trial of evidence of other acts of uncharged abuse against the same child, arguing that it was unduly prejudicial. *Id.* ¶¶ 20, 30. But the supreme court held that testimony about the other acts "allowed the victim to describe the full scope of the context in which [the defendant] abused him over three and one-half years." *Id.* ¶ 31. The court also determined that "[c]ontrary to [the defendant's] suggestion that the aggravating offenses were 'discrete and separate from the primary' offense, . . . they were essentially interchangeable, were of the same nature and character as the primary offense, and were carried out on the same victim during the same uninterrupted course of conduct." *Id.* While the *Reed* court noted that prior acts evidence is not generally admissible in cases involving multiple victims because it "could inappropriately lead jurors to conclude that if the defendant abused [others], then he likely also abused [the victim in question]," the court observed that "[t]his is clearly different from the situation in which a defendant commits essentially interchangeable acts of abuse against a specific victim through a specific course of conduct." *Id.* ¶ 31 n.5. The court therefore admitted the prior acts, determining that "[s]uch evidence of multiple acts of similar or identical abuse is unlikely to prejudice a jury; jurors will either believe or disbelieve the testimony based on the witness's credibility, not whether the witness asserts an act occurred three times or six." *Id.* ¶ 31.

¶19   Like *Reed*, this case involves an adult defendant who had a relationship with a young victim and then sexually abused that child in a number of ways on multiple occasions over several years. And the acts of "fondling the victim's genitalia and anal area, performing fellatio on the victim, and engaging in sodomy" that the *Reed* court characterized as "essentially interchangeable acts of abuse," *id.* ¶¶ 6, 31 n.5, are not unlike the course of prior abuse that Stepdaughter described here. As in *Reed*, the trial court here had a reasonable basis for its determination that Lintzen's prior acts of abuse against Stepdaughter were part of

an ongoing pattern of abuse, a "course of conduct," with considerable probative weight because they were all acts of a sexual nature committed against a single child victim. It was not unreasonable for the trial court to conclude here, as the court did in *Reed*, that jurors would "either believe or disbelieve the testimony based on the witness's credibility, not whether the witness asserts an act occurred three times or six." *See id.* ¶ 31. Moreover, it is important to note that in weighing the probative value of evidence against the danger of unfair prejudice, the court in *Reed* was not working within the context of rule 404(c), as that rule was still years away from being adopted. Here, under rule 404(c), the probative weight of the prior acts evidence was significantly greater—and the risk of *unfair* prejudice considerably less—because the rule now permits juries to consider a defendant's propensity to molest children as demonstrated by prior acts of child molestation. As the trial court stated here, "the accused's propensity is the reason for admission and no longer constitutes unfair prejudice."

¶20 Despite *Reed*'s similarities to the case at hand, Lintzen argues the trial court's reliance on *Reed* was misplaced because it failed to take into account the guidance of later cases, particularly *State v. Balfour*, 2008 UT App 410, 198 P.3d 471, and *State v. Hildreth*, 2010 UT App 209, 238 P.3d 444. He claims that those cases "recently and repeatedly determined that presentation of more egregious prior acts to a jury in a criminal matter pertaining to sexual assault is prejudicial to a defendant." But both of those cases involved questions about the admissibility of evidence showing that the defendant had committed prior sexual offenses against different adult victims; there was no "course of conduct" against a single child victim as there was here.

¶21 In *Balfour*, this court determined that the defendant's touching or attempted touching of the breasts of multiple women were all acts similar to each other, but the same defendant's actions of rubbing his penis against a different

woman's vagina over her clothing sixteen months earlier was not. 2008 UT App 410, ¶¶ 3, 4, 6, 7, 21, 30. It is not at all clear that the court would have reached the same conclusion had all the acts involved the same victim, especially had the victim also been a child and the defendant's propensity to molest children thus a legitimate consideration for the jury.

¶22  *Hildreth* is similarly distinguishable. In that case, we determined that four separate incidents occurring over a span of three years, involving four different victims, "different body parts, different levels of undress . . . , and different types of touching" did not support a finding of "a parallel fact pattern." *Hildreth*, 2010 UT App 209, ¶¶ 35–36 (citation and internal quotation marks omitted). As such, *Hildreth* has limited applicability in a case such as this where the prior acts sought to be admitted involve a defendant's repeated sexual abuse of the same child victim over a prolonged period.

¶23  Lintzen argues these cases still support his position, emphasizing that both *Balfour* and *Hildreth* couple factual similarity and temporal proximity together. *See Balfour*, 2008 UT App 410, ¶ 28 (determining joinder must involve circumstances both "similar in facts and proximate in time"); *see also Hildreth*, 2010 UT App 209, ¶ 37 ("Our conclusion is underscored when [the defendant's] conduct is viewed in light of the lack of temporal proximity of the events."). As a result, he argues that the trial court wrongly determined that the Charged Incident and the prior acts were similar when they were as many as five or six years removed from each other. But in both *Hildreth* and *Balfour*, the courts did nothing more than what *Shickles* generally prescribes—consider the implications of each of the applicable factors under the circumstances of the case and then weigh and balance them together to determine whether the probative value of the prior acts evidence "is substantially outweighed" by the danger of unfair prejudice under rule 403. *See State v. Burke*, 2011 UT App 168, ¶ 34, 256 P.3d 1102; *see also* Utah R. Evid. 403. Thus, *Balfour* and *Hildreth* do not support a view that similarity is itself

dependent on temporal proximity; rather, they simply acknowledge that both factors should be appropriately considered in the course of a *Shickles* analysis. As a consequence, Lintzen misses the point when he argues that if sixteen months was deemed too long to be considered temporally proximate in *Balfour*, admission of the prior acts in this case was foreclosed because they took place over a period of five or six years. The trial court appropriately analyzed the temporal proximity issue differently here because the prior acts involved a course of conduct against the same child victim, a significant distinction from the circumstances in *Balfour*.

¶24 Lintzen's additional arguments related to the court's similarity analysis are also unpersuasive. Lintzen points to our statement in *Balfour* that "[t]he evidence in this case involves the touching of protected body parts" and not "allegations of more intrusive conduct, such as rape or forcible sodomy," 2008 UT App 410, ¶ 26 (internal quotation marks omitted), to support an argument that acts of rape or sodomy should always be considered dissimilar from less egregious acts of sexual conduct, such as the genital touching in the Charged Incident. And Lintzen notes that, in contrast, the court in *Reed* found the prior acts and the charged conduct to be "essentially interchangeable," *State v. Reed*, 2000 UT 68, ¶ 28, 8 P.3d 1025, a characterization Lintzen contends cannot apply in his case because the alleged prior acts would constitute rape or sodomy of a child—more egregious crimes than the aggravated sexual abuse charge he was faced with. *See* Utah Code Ann. § 76-5-402.1 (LexisNexis Supp. 2014) (rape of a child);[7] *id.* § 76-5-403.1 (sodomy on a

---

7. Because no substantive changes have been made to the relevant statutes, we cite the current version of the Utah Code for the convenience of the reader.

child); *id.* § 76-5-404.1 (aggravated sexual abuse of a child).[8] But, as we have discussed, the court's determination in *Reed* that the crimes were "essentially interchangeable" encompassed a range of conduct—"fondling the victim's genitalia and anal area, performing fellatio on the victim, and engaging in sodomy," 2000 UT 68, ¶¶ 6, 28—that was not unlike the prior acts of abuse at issue here, though the charged crime (sodomy) was more grave there.[9] Further, the core circumstances in both *Reed* and this case are perhaps the central distinction from both *Balfour* and *Hildreth*: the prior acts were all variants of sexual abuse committed by the defendant against a single child victim as part of an ongoing course of conduct. And while the trial court acknowledged prior acts of sodomy were "more egregious" than the charged conduct, it concluded that the prior acts were still "generally consistent [with] the digital penetration" alleged to have occurred in the Charged Incident, essentially a finding the prior acts were, as in *Reed*, "of the same nature and character as the primary offense." *See id.* ¶ 31. Were the prior acts here

---

8. While all are first degree felonies, aggravated sexual abuse of a child carries a potential sentence of fifteen years to life and the others twenty-five years to life. *See* Utah Code Ann. § 76–5–402.1(2)(a) (LexisNexis Supp. 2014) (rape of a child); *id.* § 76-5-403.1(2)(a) (sodomy on a child); *id.* § 76–5–404.1(5)(a) (aggravated sexual abuse of a child).

9. In *State v. Reed*, 2000 UT 68, 8 P.3d 1025, the charged act was among the more serious of the acts alleged, *see id.* ¶¶ 1, 6, whereas here, the prior acts of rape and sodomy the State sought to have admitted were more serious than the Charged Incident in terms of their potential for punishment under Utah's child sex abuse laws. *See supra* note 8. While we recognize the admission of acts more serious in criminal gravity to show a defendant's propensity is potentially prejudicial, the trial court adequately addressed that concern.

committed against different adult victims, the analysis would have to be more in line with *Balfour* and *Hildreth*, which understandably apply a more limited notion of similarity in that context. Here, however, we find no abuse of discretion in the trial court's analysis of the similarity between the prior acts and the Charged Incident under the circumstances of this case, which involves a single child victim.

¶25    And it is important to recognize that the similarity of the crimes and temporal proximity are just two of six factors that a trial court may consider in determining the admissibility of prior acts. *See State v. Lucero*, 2014 UT 15, ¶¶ 31–32, 328 P.3d 941. Here, the trial court conducted a thorough written analysis of each of the six *Shickles* factors and determined that five of the six factors favored admission. As we have discussed, the court concluded that the similarity and time-interval factors supported admission and also concluded that three of the four remaining factors— need for the evidence, efficacy of alternative proof, and the degree to which jurors will be roused to overmastering hostility—favored admission as well. With respect to the remaining factor—the strength of the evidence—the court found that the relative weakness of the sodomy evidence weighed against its admission and the relative strength of the evidence of the other prior acts weighed equally for and against admission. After considering all of the factors together, the court determined that admission of the prior bad acts evidence was warranted. Lintzen does not challenge those conclusions, nor does he adequately address the quality of the court's weighing and balancing of the *Shickles* factors as a whole. Rather, he focuses on the similarity and temporal proximity factors, which we have already decided were analyzed appropriately. In light of the trial court's detailed and thorough analysis of the *Shickles* factors, we conclude that the court did not exceed its discretion in entering the in limine order.

II. Motion for a New Trial

¶26    After the verdict was entered, Lintzen filed a motion for a new trial, which the trial court denied. On appeal, Lintzen argues that a new trial was warranted for three reasons: (1) the in limine order was wholly undermined by changes in Stepdaughter's testimony at trial, (2) the discovery of Friend's location made available significant new evidence, and (3) the trial court had erred in refusing to receive the Nurse's report into evidence. We address each argument in turn.

A.    Continued validity of the in limine order after Stepdaughter's trial testimony

¶27    Lintzen argues that even if the in limine order was appropriate in the context of information initially available when it was entered, once Stepdaughter testified at trial that no penetration occurred during the Charged Incident, the basis for the order was so sufficiently undercut that he should have been granted a new trial. He contends that the trial court relied heavily on evidence that the Charged Incident involved digital penetration in its determination that the prior acts were sufficiently similar to support admission under the *Shickles* factors. Therefore, he argues, once Stepdaughter testified contrary to her prior statements that no penetration had occurred, the trial court's analysis could no longer withstand scrutiny. We conclude that Lintzen failed to preserve this claim at trial and is therefore precluded from raising it on appeal.

¶28    Lintzen first raised this concern in his motion for a new trial; he never brought the issue to the court's attention during the trial itself. "It is a well-established rule that a defendant who fails to bring an issue before the trial court is generally barred from raising it for the first time on appeal." *State v. Irwin*, 924 P.2d 5, 7 (Utah Ct. App. 1996). Lintzen argues, however, that he was not required to object at trial because he had already stated his objections to the in limine order prior to trial and had been

overruled. He points us to the Utah Rules of Evidence, which state that "[o]nce the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Utah R. Evid. 103.[10] But that principle is not applicable when the challenge to such an order is based on circumstances arising after it has been decided. Thus, "subsequent developments" at trial can "affect the continuing wisdom" of an in limine order to the extent that a defendant is "required to renew his request." *State v. Marks*, 2011 UT App 262, ¶¶ 73–74, 262 P.3d 13. In other words, pretrial rulings are subject to revision at trial as the evidentiary picture unfolds, but a party must request such a reconsideration when circumstances change. *Id*. This requirement is consistent with the rule that "[i]n order to preserve an issue for appeal[,] the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." *438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 (second alteration in original) (citation and internal quotation marks omitted). Here, Lintzen argues that Stepdaughter's trial testimony about the Charged Incident was significantly different from what she had told the CJC detective. While a material difference between the evidence expected and the testimony actually elicited at trial could have warranted reconsideration of the in limine order at the time the change became apparent, Lintzen let the unexpected testimony pass without comment and made no objection to any of the evidence of prior acts of abuse that was subsequently introduced.

---

10. This rule was amended in 2011 to read, "Once the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Utah R. Evid. 103(b). Lintzen refers us to the wording found in the pre-2011 version of the rule. The amendments were not substantive and do not affect our analysis.

¶29    While Lintzen did raise these concerns eventually, they were not brought to the trial court's attention until well after the trial had ended and the jury had rendered its verdict. By the time Lintzen brought his motion for a new trial, it was too late for the trial court to consider rescission or alteration of the in limine order in any way that might have affected the trial. *See State v. McNeil*, 2013 UT App 134, ¶ 46, 302 P.3d 844 (explaining that objections are timely only if raised in time to give "the court an opportunity to address a claimed error and, if appropriate, correct it" (citation and internal quotation marks omitted)). His objection was therefore untimely and his claim was unpreserved. As a consequence, we may address Lintzen's argument on appeal only if he "establishes that the trial court committed plain error; if there are exceptional circumstances; or in some situations, if a claim of ineffective assistance of counsel is raised on appeal." *See Irwin*, 924 P.2d at 6 (citations and internal quotation marks omitted). But Lintzen has failed to raise any of these exceptions to the preservation rule. *See State v. Davie*, 2011 UT App 380, ¶ 23, 264 P.3d 770 (determining that because the defendant did not raise an objection and did not argue plain error or exceptional circumstances on appeal, his claim was waived). As a result, we will not consider his claim of error.[11]

---

11. Lintzen asserts in his reply brief that any objection made at the time when the no-penetration testimony came in would have been futile because "the damage had already occurred." *Cf. State v. Ashcraft*, 2015 UT 5, ¶ 33 & n.8 (reiterating the principle that a failure to preserve will be excused when "it is apparent that an objection would be futile" (citation and internal quotation marks omitted)). But Stepdaughter's testimony that no penetration occurred during the Charged Incident occurred very early in the trial—relatively little of the testimony to which Lintzen now objects had yet come in. That being the case, it is not self-evident that any real damage actually *had* been done or that any

(continued...)

B.        Discovery of Friend's location after trial

¶30    Lintzen argues that the trial court should have granted his motion for a new trial based on newly discovered evidence, specifically the post-trial discovery of Friend's location and his supposed availability to testify. In his motion for a new trial, Lintzen represented that now that Friend had been located, Friend would be able to testify that he had found no pornography when he searched the hard drive on Lintzen's computer, that Stepdaughter "[d]emonstrated familiarity and experience with a specific pornographic website," and that Stepdaughter had told him that Brother had exposed her to pornography on a regular basis. A defendant is entitled to a new trial based on newly discovered evidence when the evidence is not "merely cumulative" and the evidence would "render a different result probable on the retrial of the case." *State v. Montoya*, 2004 UT 5, ¶ 11, 84 P.3d 1183 (citation and internal quotation marks omitted). Lintzen argues that the trial court erred in determining that Friend was not available as a witness

---

(…continued)

objection, had it been raised and sustained, would have been futile. Lintzen has failed to address how the testimony regarding the first incident of abuse—the only testimony that came in prior to testimony about the Charged Incident—damaged his case to the point it likely altered the result of his trial, especially in light of the extensive use he made of the changed evidentiary circumstances to impeach Stepdaughter's credibility as the trial proceeded. *See State v. Jacques*, 924 P.2d 898, 902 (Utah Ct. App. 1996) (holding that reversal is appropriate only if there is a "reasonable likelihood that the error affected the outcome of the proceedings"). Rather, he simply makes a conclusory statement about the futility of any objection at that point in the trial, with no analysis or reference to the record.

(and lacked credibility in any event) and that his proposed testimony was "cumulative."

¶31    At the time Friend's location was discovered, Friend had returned to Peru. Despite assurances from Lintzen that Friend had "expressed a willingness" to testify at a new trial, the trial court determined that his "voluntary return [was] unlikely" because Friend had been deported from the United States after having been convicted of several felonies. Nevertheless, Lintzen argues that the court abused its discretion by refusing to allow Friend to testify via two-way video conferencing or other technology. But such a determination is subject to the court's discretion. *See United States v. Gigante*, 166 F.3d 75, 81 (2d Cir. 1999); *Kramer v. State*, 2012 WY 69, ¶ 18, 277 P.3d 88. And given that, in the trial court's words, "[t]he oath and the attendant penalties for perjury have little effect upon a witness who is thousands of miles away from Court"—and in another country—the court did not abuse its discretion in denying Lintzen's request to allow Friend to testify remotely. The court further reasoned that even had Friend somehow been available to testify, his multiple felony convictions for theft by deception and forgery, both crimes involving falsity, together with his personal and professional relationship with Mother, would have significantly undermined his credibility.

¶32    We can find no fault in the trial court's determination that a witness with inherent credibility issues who could not legally re-enter the United States to testify and whose fidelity to the oath could not be assured if he were to testify via video conferencing technology was unlikely to "render a different result probable on the retrial of the case." *See Montoya*, 2004 UT 5, ¶ 11 (citation and internal quotation marks omitted).

¶33    The trial court's determination could have ended there, but the court went on to consider the substance of Friend's proposed testimony as well. The court concluded that Friend's testimony would have been very limited. First, the court found

any testimony related to Friend's search of Lintzen's hard drive would be inadmissible because "[t]estimony concerning the forensic search of a computer hard-drive for child pornography" must come from an expert rather than a lay witness and "the only evidence of [Friend's] expertise is his unsubstantiated statement . . . that he worked for the FBI on child pornography cases." The court considered this insufficient to qualify him as an expert witness. *See* Utah R. Evid. 702(a) (requiring that an expert witness be qualified "by knowledge, skill, experience, training, or education"). Lintzen does not challenge this determination.

¶34　Friend's remaining proposed testimony was limited to essentially three subjects: (1) Stepdaughter's statement to Friend that Lintzen had never touched her inappropriately, (2) Stepdaughter's statement to Friend that Brother regularly exposed her to pornography, and (3) Friend's observation that Stepdaughter was capable of independently accessing a specific pornographic website. While the trial court acknowledged that Friend's testimony about Stepdaughter's two statements could have been used to impeach the testimony Stepdaughter gave at trial, the court also noted that "newly discovered evidence used solely for impeachment is not generally grounds for granting a new trial." *See State v. Pinder*, 2005 UT 15, ¶ 66, 114 P.3d 551. The court further concluded that the only remaining evidence Friend could have offered, testimony regarding Stepdaughter's ability to access pornography on her own, was cumulative. Stepdaughter herself had testified that she knew how to access pornography on her own and, in addition, the jury heard about at least two occasions in which Lintzen was not involved when she had either accessed or come across pornography.

¶35　In sum, the trial court conducted a thorough analysis of the availability and potential impact of Friend's testimony and acted well within its discretion in refusing to grant Lintzen a new trial on the basis of newly discovered evidence.

C.    The Nurse's written report

¶36    Lintzen also argued in his motion for a new trial that the trial court had erred in refusing to admit the Nurse's written report into evidence. The court rejected that argument, determining as it had at trial that the report was both cumulative and inadmissible on hearsay grounds. On appeal, Lintzen has not challenged the legal basis for the court's evidentiary ruling at trial. Instead, he argues that the written report has become "vitally important given [Friend's] newly discovered testimony" and that he should be granted a new trial so the report can be admitted. He argues that on retrial, the report, combined with Friend's testimony, would support his claim of innocence and his contention that it was Brother who should have been investigated for abusing Stepdaughter.

¶37    Lintzen's argument for admission of the report is unpersuasive for two reasons. First, he has failed to challenge the court's determination at trial that the report was not admissible because it contained inadmissible hearsay and was cumulative of testimony already given.[12] *See State v. Vargas*, 2001

---

12. The report contained in writing the following statement: "[Mother] states that 'if anyone has sexually abused my daughter it would be [Brother]. He has had a pornography problem for 4–5 years and masturbates.' [Mother] states that '[Stepdaughter] and other family members have seen him do this.'" Lintzen sought to have the Nurse's written report admitted in order to provide the jury more context and information regarding the Nurse's recommendation that Brother be evaluated and the statements that led to that recommendation. The trial court found that the portions of the report Lintzen particularly wanted before the jury would be cumulative because the Nurse had already testified orally about the statements Mother made regarding Brother, and Lintzen had

(continued...)

UT 5, ¶ 34, 20 P.3d 271 (determining that because the defendant failed to "address the basis stated by the trial court for its decision," the defendant's contentions were "irrelevant" and there was no abuse of discretion). Second, Lintzen's argument focuses on the significance of the written report when viewed alongside Friend's testimony, which would require a new trial to present. Because we have already upheld the trial court's determination that Friend's evidence does not warrant a new trial, Lintzen's contingent argument regarding the Nurse's report fails as well.

## CONCLUSION

¶38    We conclude that the trial court did not err in its rule 404(c) analysis and initial entry of the in limine order. We also determine that the trial court did not abuse its discretion in refusing to grant Lintzen's motion for a new trial on the basis of changes to Stepdaughter's testimony at trial, the discovery of Friend's whereabouts, or admission of the Nurse's report. We therefore affirm the challenged decisions of the trial court in all respects.

_____

(…continued)
been provided the opportunity for cross-examination. The trial court also found that the report contained statements of other out-of-court declarants and was not admissible in whole or in part under any hearsay exception. Lintzen has not challenged this reasoning.